24-2324 Eastern Missouri United States v. Phillip Cutler All right, Mr. Concannon, we'll hear from you first. Court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act. You may proceed. You may, of course. May it please the Court and the prosecution and, of course, my client, who is not present here today. I would first like to start by stating some of the basic facts of this case, and I think they're important. This was not a particularly, I believe, strong case against the defendant. They had no witnesses to the crime. They had no DNA evidence linking the defendant to the crime. They had no gun recovered of the crime. What they had was, as they stated in their brief, a flurry of communication between the defendant, my client, and another person. They had location devices that, of course, they put on phones that place my client at the scene of the incident, the murder. But nothing that actually places him there. Just location device, location GPS coordinates, and other things like that. There was no... You know, counsel, I just want to stop you. This seems like a... You're right. It's not a direct, sort of a direct evidence case. But it is... I've sat over thousands of criminal appeals, and this is a pretty strong circumstantial case. I mean, for goodness sakes, I think this is the case where your client ate two pages of his notebook during an interview, which shows consciousness of guilt. And so I'm... You know, I was actually going to ask you, isn't the air here harmless? But you know... Well, Judge, that's... I was just going to get to that. And that is certainly, when he's eating a note, you know, certainly that's problematic and that's circumstantial. But again, that's circumstantial evidence. There's a lot of very strange things that the defendant does in this case, and that's admittable. I mean, there's no way to sugarcoat or deny that. What I would say to that is, there's a lot of people that may do very strange and unusual things, especially when they're nervous, especially when they're confronted with law enforcement. They may do things to act guilty. When someone is pulled over by the police, by the state trooper, I bet their heart gets pounding. They may say things that don't make sense. But they're nervous, they're upset, and they're scared. And there is only, as even the court pointed out, circumstantial evidence. You know, swallowing, you know, certain evidence, certain pieces of paper, we'll never know why he really did that. It's all circumstantial. What's the supposed error? That's the supposed error in this case, and this is where I think they're related. And there's almost a level of detail in this case ad nauseum about what I was talking about. But the error in this case is the court violated the rules of evidence, the Rule 807, in this case, the residual exception, yes. And why that's related to what I was saying before is this is- Why do you think that the evidence here satisfied the residual exception? Judge- It's hearsay otherwise, right? That is correct. It's an out-of-court statement. Well, there is an argument to be made that it certainly explains law enforcement conduct, and that there's certain, it's not hearsay because it's not really offered for the truth of the matter, but I'll get to the direct question you asked. It falls within that exception to Rule 807 for multiple reasons, and due to the interest of time, that statement by that witness has a guarantee of trustworthiness. This is a woman that gave a statement about what she heard three hours after the police, the government, said the murder occurred. It has a level of trustworthiness because why would this woman lie? Why would she make this up? This is an investigator for the circuit attorney's office. I think it has some guarantee of trustworthiness. The second, and this is directly to the court's question, is it has an evidence of a material fact. The death, the time of death is extremely crucial in this case. So it's definitely material, and definitely those two findings in and of itself show that it falls within the exception pursuant to Rule 807. Rule 807 is, you know, one time we kind of interpreted it as the, quote, catch-all exception, and it was applied with much greater frequency. The rule itself was tweaked. You know, it's not that it's disfavored, but, you know, there is certainly been a greater emphasis placed on necessity and a greater emphasis placed on its probative value, more probative than any other evidence. And then there also is the question of relevance and materiality here. I mean, this is a little strange, but I preside over more murder trials than I'd like to mention. But, you know, there's forever people that I, like, people are appearing after they're supposedly dead. Witnesses claim they see or hear something. Sometimes it comes in, sometimes it doesn't. Here you have a pretty, you know, if it doesn't have, well, it appears to me it's hard to make the argument that it's not being offered for the truth of the matter asserted, because for it to have any relevance, you have to believe what was said, okay? And that's the problem, you know, as far as, and so I think you really are in 807 land. But it's not of great weight, particularly when they found the TV on, right? I mean, and so an open door, hearing voices, hard to tell the difference between a TV and quote unquote whispering, right? That could be possible. That is possible, and I think that's part of the analysis that the judge did. And in the end, he just didn't think it was very relevant or very material, and he excluded it. Well, some analysis certainly was done by the district court. And I understand what the court's stating about this evidence, about the probative value of it. But I think there's another factor to consider in 807. As the court said, we are in 807 land, in that what is the fundamental purpose that it serves? And the cases talk about the purpose allowing this evidence is that it gives the defendant the right to put on his defense pursuant to the Sixth Amendment. That was so fundamental of a right. That certainly, any issues would be outweighed by that right. And those arguments that the court brought up, the government could address that in closing argument. And they could counteract that. I want to ask you about hearsay though, but I guess I'm less convinced by your 807 argument, but intrigued by the hearsay point, because if you're offering it for the shoddiness of the investigation. I was taught in law school that's not hearsay. And so, I'm just curious what your best argument is along those lines. Well, my best argument, you mean as far as the shoddiness of the investigation? Well, that it's not hearsay. Well, that it's not hearsay because it's not offered for truthfulness, whether there were voices. But explaining, as the court said, the shoddiness of the investigation. Why didn't they follow up on that? Why didn't they get camera footage of that time? So, the argument would be if they got this wrong, then they got a whole lot of other things wrong. Or didn't investigate it. If they didn't investigate this, they didn't investigate a whole bunch of other things. Exactly correct, Judge. And there were parts of they didn't get certain camera footage at certain times. Don't you have to find that it's truthful in order to draw those inferences? I don't think you actually would have to find it truthful. Well, if the woman never said it, then how could the officer, and it wasn't true, what would the officers be investigating on? Well, I would say, you could definitely say that you'd have to establish that she said it. But as far as the truthfulness of whether she heard voices in there, certainly, you may not have to establish the truthfulness of that. If there's a bank robbery investigation and someone comes in and says, I saw somebody, I have evidence that someone else did it and the FBI ignored it, that may be relevant to the whole investigation. Okay, thank you. I have nothing further. Very well, thank you for your argument. Thank you. Mr. Dunkel, we'll hear from you. Thank you, Your Honor, and may it please the court. I'm Jason Dunkel on behalf of the government in this case. In the court below, Cutler advanced six facts that contributed to what he believed was the trustworthiness of the statement. I'd like to go through those facts. Two of them do not give the court, or the court should not give any weight. And the other four are basically reduced to too generic of a fact pattern, where those facts are going to be present far too often for this court to apply its ruling that Rule 807 applies rarely. So those six facts come down to the statement was made on the same day of the murder, that the witness and the victim were close friends, that the statement was made in response to police questioning, that there was no evidence that the detective's influence or coerced anything about the statement, that the two 807 statements to the detective and to the investigator were consistent with each other. And sixth, that the witness was working as an investigator for a local prosecutor's office. So the two that bear no weight whatsoever is the statements that depend on the 807. So the statement that they were close friends, and the statement that the two, or the fact that the two 807 statements were consistent with each other. If the facts have to come out of the content of the statement, that has no weight under 807 because you'll need to look to external evidence of this trustworthiness. So that leaves us with four things. A statement made on scene at the time of the crime, or not at the time of the crime, but on the same day of the crime. A statement that was not coerced by police, but said to police. And a statement that was made by somebody that I would characterize as in a law enforcement adjacent profession, somebody who was an investigator for the prosecutor's office. But if those four facts are sufficient, then any time you have one law enforcement officer providing information to another law enforcement officer on the scene of a crime, those same four facts are going to be met. And we're going to have 807 evidence coming in for every murder, every bank robbery, every basically on scene investigation where multiple investigators are working as a team and trying to contribute to the investigation. It is clear that when this court has said before the 807 applies rarely, that was not the situation that we were considering here. I think that if we look to the district court case in Minnesota, the Rizika case that was relied on by the defendant below, Cutler below. That provides a much better example of three indicia of trustworthiness that gets you to 807. So in that case, while the statement wasn't made under oath, it was made to a federal law enforcement officer. So you do have criminal liability that attaches under 18 U.S.C. 1001. So you're not facing a potential perjury prosecution for lying, but you are facing prosecution if you do lie. Second, and I think this is a very important distinction. That conversation, that interview with FBI agents occurred at a time in the investigation where the FBI's investigation was very mature. This investigation was at its very infancy. Infancy being the word that the court used below. The detectives were just in an information gathering mode. They were trying to find out what other people knew. They were not questioning or prodding or trying to in any way serve in the way that a cross-examination in court would serve. Those FBI agents in the Rizika case, they had a mature investigation. They had information that they could use to question the assumptions of the statement. To question poor perceptions that went into the statement or outright lies. In the opening argument, opposing counsel referenced that this woman had no reason to be lying. But trustworthiness were not just considered about whether she's lying. We're considering whether she's lying. We're considering whether she's mistaken. We're considering whether there's incorrect assumptions that are built into her statement that would reveal that the statement does not have trustworthiness. And this gets to the TV issue. What about the, I just want to ask about the hearsay, the underlying hearsay question. Tell me why this is hearsay. This is hearsay because for the use that they wanted to use it for, they wanted the jury to accept the truth that this male voice was heard at 7.15 a.m. When you were asking opposing counsel, you used the phrase, if they got this wrong. So if you're wanting the jury to question whether the police got this wrong, you were asking the jury to find as a factual matter that this statement is true. So if I were to say, for example, in a criminal investigation, I'm a witness and I told the police, I saw someone else do it. And they wanted it not for the truth of the matter asserted, but to show that the police had not followed up on that lead. You're telling me that's hearsay? Yes, because you are using that statement for the truth that somebody else did it. No, I'm not. I'm using it to show that the investigation wasn't thorough, that you, the prosecution, or you, the police, did not follow up on that lead. Well, that was not the whole thing in the Love case. Well, Love was different. In Love, what happened was somebody's defendant was trying to get in his own alibi, which I think is a completely different case where you have a third-party witness here. It still goes to the truth. You're still wanting the jury to accept the truth of that statement in order for them to then evaluate or for them to then impugn the credibility of the investigation. Aren't you trying to get the jury not to get the truth, but to reach the conclusion that they may not have investigated leads? Let me ask you this. How would you get that in, that the prosecution didn't investigate leads? You just ask the officer, right? Yes. You just ask him, did you know this and did you investigate it? Yes. You can do it in different ways where you don't reveal the full contents of the statement, and that was done. When Detective Biondolino was testifying about what video they pulled, on direct examination, we talked about pulling the video at the time of the crime that the government believes the murder occurred, from 259 to 347. And then on cross-examination, they were allowed to, and they did in fact get into whether or not he reviewed video from 4 a.m. to 8 a.m., focusing around the time that the defense believed that this male voice was in the apartment. So you were able to get into what investigative steps they took and what they did. Could you have asked the officer, did this third-party witness tell you that there was somebody else in the house? In your view, could they have asked the officer that directly? I don't believe they would. So then how do you get it in? Because you can't get that statement in to be able to show that there was a shoddy investigation. I mean, that's the whole point of the evidence. But you can ask them about what investigative steps they took. Could the defendant here try to ask the officer whether he knew about this woman's statement? There was no effort to ask that, was there? Correct. They only did it in the context of wanting to get into the words of the statement itself and get that statement into evidence. That's what I mean. They wanted to offer the statement. But did they propound on cross-examination a question to the officer about whether he investigated it? Excuse me. They did not. So that issue isn't really before us, whether they could have asked that question. Correct. There was proper objection to it. That's not before us. But that was an avenue available. That was an avenue available. And also if you just tell me it wasn't an avenue available, they couldn't have asked that question. It's not an avenue available on appeal because they did not ask that question. I see. That's different. You made me think that they could not have asked that question at all. So that's a different answer. I misunderstood you. Okay. And just to crystallize what exactly was presented, in the written motion eliminating, that's document number 112, the defense said, we want this statement not for the truth of the matter, i.e., to prove that a voice was heard. We want to show it that there was a male who was present at 7.15 a.m. and that the victim was still alive. So while they're characterizing this as it's not for the truth of the matter, their motion reveals that very much so they wanted this for the truth of the matter. The reason that they wanted it did not match up with the cloak that they put over it as not for the truth of the matter. In that document, they were very clear they wanted this for the truth of the matter to show that that victim was alive at 7.15 a.m. What about harmless error? Assuming that there was an error, wasn't the error harmless? I ask opposing counsel that, and I want to give each side equal opportunity to answer that. Yes, as we argued in our brief, the error was very much harmless in this case. You have the defendant gave three separate statements, one on the day he was interviewed, one about three months later when he was interviewed, and then a third statement when he testified at trial. There were incredible discrepancies between the three of these statements. One of them, he's indicating he's never been at that apartment, was never there. If his phone was there, it must have been because his car was stolen while the phone was in it. And then he testifies, oh, no, he was there that night. Cornelius Green asked him to go to the victim's house and sit outside. He waited four hours before he did that to try and find out if there was a boyfriend there. He decided to go at 3 o'clock in the morning rather than 11 o'clock at night when asked. As you mentioned, when he was being interviewed during a break in the interview, he took two pieces of paper from his notebook and consumed those. He gave an incredible statement that he was trying to hide evidence of marijuana purchasing. So he ate the piece of paper that had the marijuana dealer's number on it and then the paper behind it that would have the imprint. But the video showed that he ate one piece of paper and then flipped and then ate another piece of paper. He didn't eat two consecutive pieces of paper. And you said there was evidence that the marijuana dealer's number was on one of those pieces? That was his self-serving statement for what that was. He said that while he was on the Greyhound into St. Louis, he met a marijuana dealer on the bus and he wrote down that person's number. Why somebody's number and maybe a first name would be in any way inculpatory and you need to get rid of that, he did not explain. He also admitted that he received a $2,500 package in the mail from Cornelius Green in order to pay for his $100 bus ticket into St. Louis, and that was a loan for his trip. He admitted that after the murder occurred, Cornelius Green was paying for his commissary and his jail calls while he was in custody for killing the girlfriend of Cornelius Green. And he also admitted that he received a second package in the mail that apparently, to his statement, included only a teddy bear and cookies. The teddy bear was for his son. But he lived with his son in Oklahoma who was 19 years old and probably not of teddy bear age. So every statement that he made on there was thoroughly cross-examined. This is, I believe, why the jury took an hour and 15 minutes to deliberate on the defendant's guilt and return a verdict of guilty on both counts. We believe that the evidence was very strong. Harmless error applies. But we believe that, anyways, the statement was not admissible under 807. And we ask for you to affirm. Thank you. Very well. Thank you for your argument. I believe all time has expired, so the case is submitted and the court will file a decision in due course.